Anthony M. Solis, SBN 198580
A Professional Law Corporation
23679 Calabasas Road, Suite 412
Calabasas, CA 91302-1502
213-489-5880 - Phone
213-489-5923 - Fax
Anthonysolislaw@gmail.com

Attorney for Defendant
Derek Longoria

United States District Court

Central District of California

Eastern Division

| | |
|---|---|
| United States of America, | Case No.: ED CR 16-cr-135-JGB |
| Plaintiff, | Reply to Government's Opposition to Defendant's Motion for Compassionate Release |
| v. | |
| Derek Longoria, | |
| Defendant. | |

Defendant, Derek Longoria, by and through counsel of record Anthony M. Solis, replies to the government's opposition to defendant's Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A).

Dated: May 19, 2020
                                  Anthony M. Solis,
                                  A Professional Law Corporation

                                  *Anthony M. Solis /s/*
                                  By: Anthony M. Solis
                                  Attorney for Defendant
                                  Derek Longoria

## Memorandum of Points and Authorities

The government opposes the defendant's motion for Compassionate Release. The main thrust of the government's opposition is:

1. Mr. Longoria failed to exhaust his administrative remedies;

2. Mr. Longoria already tested positive for Covid-19;

3. Releasing him would endanger the community;

4. The BOP is taking adequate measures to ensure inmate safety.

Each of these issues will be addressed, to the extent it has not already been addressed in the initial motion. The "exhaustion" issue will be addressed last.

**A. Mr. Longoria's Positive Test Doesn't Innoculate Him From Harm.**

To be sure, Mr. Longoria's motion was filed **after** he had already tested positive for Covid-19. This was due largely to the fact that during the period of time just before the motion was filed, the inability of the BOP to control the virus was on full display: at the time the motion was filed, the number of inmates testing positive for the coronavirus approximated 70% of the inmate population. The fact that Mr. Longoria became infected does not diminish the potential harm, nor does it "moot" the relief requested in his motion.[1]

In fact, the CDC has warned, in response to a Frequently Asked Question (FAQ) "If I have recovered from Covid-19, will I be immune to it?"

> CDC and partners are investigating to determine if you can get sick with COVID-19 more than once. At this time, we are not sure if you can become re-infected. Until we know more, continue to take steps to protect yourself and others.

---

[1] In another case litigated by undersigned counsel, concerning FCI Lompoc–another BOP disaster–the government took the position that it was only "speculative" that the inmate would become infected. During the litigation of the compassionate release motion, the inmate became infected inspiring the government to deem the motion "moot." *See United States v. Alvarez-Tostado;* 98-cr-508-GW-1, Dkt. ##675, 681.

**Reply to Government's Opposition to Motion for Compassionate Release**

In reality, populations similar to custody have experienced positive tests after recovering from an earlier infection of Covid-19. In the notorious case of the aircraft carrier U.S.S. Theodore Roosevelt, reports on May 17, 2020 revealed that at 13 sailors aboard the ship have tested positive again for Covid-19 after recovering from the disease and returning to the ship. Some of these sailors became symptomatic (body aches, headaches flu-like symptoms) **after** they had earlier tested positive and recovered.[2]

In fact, the World Health Organization released a statement cautioning against the use of "immunity passports" or "risk-free certificates" for people who have recovered from coronavirus infection.:

> There is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection.[3]

According to Marc Lipsitch, Professor of Epidemiology at the Harvard T.H. Chan School of Public Health: "Among the many uncertainties that remain about Covid-19 is how the human immune system responds to infection and what that means for the spread of the disease. **Immunity after any infection can range from lifelong and complete to nearly nonexistent.**" (Emphasis added)[4] Lipsitch also recognizes that "Mild illness . . .might not always build up protection." *Id.*

In short, with an insulin-dependent diabetic like Mr. Longoria–a clearly-identified vulnerable and at-risk group–the fact that he has already tested positive offers no known protection against re-infection and the development of symptoms.

---

[2] https://www.foxnews.com/us/uss-theodore-roosevelt-sailors-positive-coronavirus-second-time, May 17, 2020. Other reports indicate 14 sailors re-tested positive.

[3] https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19

[4] Mark Lipsitch, *Who is Immune to the Coronavirus*, N.Y. Times (April 13, 2020).

**Reply to Government's Opposition to Motion for Compassionate Release**

**B. Mr. Longoria is not a Danger to the Community**.

As set forth in the underlying motion, Mr. Longoria waited at home patiently in advance of the filing of charges in this matter. Indeed, in the PSR, it is reflected that agents served a search warrant at Longoria's home on March 25, 2015–three years after the offense conduct. His initial appearance did not occur until November 7, 2019 (Dkt. #5). This is an approximate 18 month period where (1) Mr. Longoria knew about the investigation and potential charges; (2) did not flee or re-offend; (c) obtained counsel and awaited direction from the US Attorney's Office. After his initial appearance, he remained and home in the custody of his parents, without incident until his surrender in January 2019.

In short, Mr. Longoria – since the offense conduct in 2011/2012 has demonstrated that he is not any danger to the community. This includes with or with out criminal justice supervision. Any relief the Court would grant now, however, would come with strict criminal justice supervision.

**C.   The BOP Has Clearly Not Taken Adequate Measures to Protect the Inmate Population**

The government paints a rosy portrait of the government's efforts to contain the virus and protect the inmate population. The government underscores "BOP's commitment to fighting COVID-19 and protecting inmates" Govt. Brief p. 7. The government cites the implementation of the Pandemic Influenza Protocol in January 2020, modified as a COVID-19 Action Plan. *Id.* at p. 5. Since then, according to the government "[t]he BOP has serially escalated its response." *id*.  Despite all its plans, efforts, and escalation, FCI Terminal Island still had, at one point, 70% of its inmates infected. And one fact conveniently omitted from the government's brief: **Eight (8) FCI-TI inmates have died of Covid-18**.[5] Depite the assertions in the Declaration of Maricela Bugarin's Declaration, appended to the government's opposition, about all

---

https://www.dailybreeze.com/2020/05/13/8th-inmate-dies-of-coronavirus-at-terminal-island-federal-prison/

**Reply to Government's Opposition to Motion for Compassionate Release**
4

the efforts made by the institution to protect inmates, the Warden at FCI-TI has just become a defendant in a class-action lawsuit alleging that the BOP has not and cannot adquately protect and care for the inmates at the facility.[6] The allegations, based upon information culled from numerous inmates at FCI-TI and family members of FCI-TI inmates The allegations in the Complaint are deeply concerning. Clearly, there is a wide divergence between the measures alleged in the Bugarin Declaration (*see*, specifically ¶ 12(a)-(n)) and the allegations made in the Complaint filed in *Wilson* are deeply troubling and fly in direct conflict with the assertions made in the Bugarin Declaration. One need look little further, however, at the numbers despite the BOP's alleged efforts: **approximately 70% of inmates infected**, **at least 15 staff members and 8 dead inmates.**[7]  A copy of the FCI-TI-related complaint is attached hereto as **Exhibit A**. Its allegations and Declarations are incorporated herein by this reference.

### D. The Court has the Authority to Grant a Sentence Reduction Without Waiting the 30-day window to Lapse.

#### 1. The BOP is not a Jurisdictional Gatekeeper

This Court has jurisdiction to grant a sentence reduction despite Mr. Longoria's failure to exhaust his available administrative remedies.

Under § 3582, BOP is, essentially, a claims processor with a 30-day right-of-first refusal on these motions—not a jurisdictional gatekeeper. The Supreme Court not only recognizes the difference between claims-processing rules and jurisdictional requirements but "has emphasized the necessity of observing [that] important distinction" and "warding off profligate use of the term 'jurisdiction.'" *U.S. v. Haney*, __ F. Supp. 3d __, 2020 WL 1821988, at *2 (S.D.N.Y. 2020) (citing *Reed Elsevier, Inc.*

---

[6]*Wilson, et al. v. Ponce, et al.;* Case No. 20-cv-000451-TJH-PVC (CA-CD)(filed 5/16/20)

[7]Lest the FCI-TI numbers seem anomalous, as of today (5/20/20), FCI Lompoc has 873 inmates and 8 staff members infected with the virus. Two inmates have died.
*See* bop.gov/coronavirusLompoc has also been the subject of a class action lawsuit:*Torres, et al. v. Milusnic, et al.* Case No. 20-cv-4450-CBM-PVC (CA-CD)(Filed 5/16/2020).

**Reply to Government's Opposition to Motion for Compassionate Release**

*v. Muchnick*, 559 U.S. 154, 161 (2010); *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013)). There is a "bright line test": "*only* if Congress has clearly stated that the rule is jurisdictional" is the rule jurisdictional—"absent such a clear statement" restrictions are "nonjurisdictional." *Id.* (citing *Auburn Reg'l*, 568 U.S. at 153) (emphasis added).

The analysis is simple: section 3582 contains no clear statement that exhaustion is jurisdictional. *Id.*[8] Without that statement, the exhaustion requirement "is a claim-processing rule." *Id.* at *3.[9] And DOJ has agreed in other cases. *See U.S. v. Gentille*, 2020 WL 1814158, at *3 (S.D.N.Y. Apr. 9, 2020) (government concedes exhaustion "is not jurisdictional, but rather is a claims-processing rule").

Even with jurisdiction established, the Court must still decide whether the

---

[8]*Haney*, 2020 WL 1821988, at *2–3 ("Tellingly, the word 'jurisdiction' . . . never appears."). Similarly, courts have found that § 3582(c)(2) contains no jurisdictional bar. *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1245–47 (11th Cir. 2017); *United States v. May*, 855 F.3d 271, 274–75 (4th Cir. 2017); *United States v. Beard*, 745 F.3d 288, 291–92 (7th Cir. 2014); *United States v. Trujillo*, 713 F.3d 1003, 1006–08 (9th Cir. 2013); *United States v. Weatherspoon*, 696 F.3d 416, 421–22 (3d Cir. 2012).*United States v. Green*, 886 F.3d 1300, 1306 (10th Cir. 2018).

[9]The Supreme Court has treated similarly designed statutes as claims-processing rules, not jurisdictional bars. The statutory scheme in compassionate release is similar to the scheme for employment claims in Title VII, where an employee must first file an EEOC complaint, give the agency the "first option" to file suit, and if it declines, the complainant may file in court. *See Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1846–47 (2019). Both the EEOC and BOP play similar roles in these statutory schemes: they "investigate" and decide whether to put the claim before the courts—but they "do[] not adjudicate the claim." *See id.* at 1846. The similar scheme shows this Court does not face a jurisdiction issue. In *Davis*, years into litigation, the county argued the court lacked jurisdiction because the plaintiff had failed to first file an EEOC claim. *Id.* at 1848. The Supreme Court held the EEOC "charge-filing requirement" does "not speak to a court's authority," and is "a processing rule," not a jurisdictional bar. *Id.* 1850–51. Just like the EEOC, the BOP does not adjudicate sentence-reduction requests, it merely investigates and determines who puts the case before the court. *See also Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 385–86 (2d Cir. 2015) (holding that Title VII's statutory requirement is a "precondition to suit," but not jurisdictional, and therefore "is subject to equitable defenses" and court may waive) (remanding for district court to consider futility); *Fernandez v. Chertoff*, 471 F.3d 45, 58 (2d Cir. 2006) ("[C]ourts may, in their discretion, waive administrative exhaustion requirements under circumstances where the administrative remedy is inadequate because the agency cannot provide effective relief."); *Rein v. McCarthy*, 2020 WL 1042220, at *1 (2d Cir. Mar. 4, 2020) (deadline for filing administrative complaint "is subject to waiver, estoppel, and equitable tolling")

**Reply to Government's Opposition to Motion for Compassionate Release**

claims-processing rule can and should be excused.

### 2. The Court Can Excuse the 30-day Wait Period.

The Court can excuse the 30-day wait period for six (6) reasons.

#### a. The law does not include a true exhaustion requirement

Section 3582(c)(1)(A) contains not a normal administrative-exhaustion requirement at all; instead, Congress created an odd quasi-exhaustion right-of-first refusal rule. As one district court recently noted, the law imposes not an exhaustion rule, but an option: the statute "requires the defendant to **either** exhaust administrative remedies <u>or</u> simply to wait 30 days." *Haney*, __F. Supp. 3d __, 2020 WL 1821988, at *3 (S.D.N.Y. 2020) (emphasis in original). In creating that choice, Congress moved away from the stricter exhaustion mandates seen elsewhere in prisoner-generated litigation like the Prison Litigation Reform Act (and even that mandate contains an exception). *See Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (because PLRA states "No action shall be brought" absent exhaustion, a "court may not excuse a failure to exhaust" unless the statutory exception applies).

But Congress's decision to create a right-of-first refusal rule makes sense because BOP only triages compassionate release requests—there are no agency hearings, no administrative judges, no evidence, no record; the agency is powerless to actually grant anything. It simply weeds out frivolous requests. Because Congress created only a 30-day right-of-first refusal, the Court may excuse compliance under long-standing exceptions.

#### b. The legislative history shows courts—not the Bureau of Prisons—were meant to control the sentence-reduction power.

The BOP was never meant to control compassionate release the way it has. In 1984, Congress passed § 3582(c) as part of the Comprehensive Crime Control Act—the same act that created new mandatory minimums, the Sentencing

---

**Reply to Government's Opposition to Motion for Compassionate Release**

7

Commission, the guidelines, and phased out parole.[10] It was a radical penal metamorphosis,[11] and Congress was concerned the new law would upset the power balance between judges, prosecutors, and the Commission. Indeed, the official Senate report expressly listed that fear: these new "systems may shift discretion from the judges to the prosecutors" and "the Sentencing Commission may have too much power."[12] It was a problem of checks and balances.

In part to combat those concerns, Congress created what it explicitly called a "safety valve"—the power to reduce sentences in § 3582. With the resentencing power in judges' hands, this "safety valve[] . . . assure[s] the availability of specific review and . . . *keeps the sentencing power in the judiciary where it belongs*."[13] Indeed, Congress felt comfortable shuttering the parole commission only because the resentencing task would fall to the courts: "it is unnecessary to continue the expensive and cumbersome Parole Commission" because the new law places "the question whether there is justification for reducing a term of imprisonment" up for "court determination."[14]

### c. Congress cut BOP out of sentence reduction, showing it intends broader review of sentence-reduction.

For more than a decade, BOP has ignored all efforts to expand compassionate release, allowing prisoners to die while their petitions lingered, refusing to present motions even for those who qualified. With the First Step Act, Congress has now all but cut the agency out, intending that compassionate release becomes what it was always meant to be—compassionate.

---

[10] *See* Sen. Rep. 98-225, at *1, 1983 WL 25404 (Aug. 4, 1983).

[11] *Id.* at *1 (the bill is "the product of a decade long bipartisan effort . . . to make comprehensive improvements to the federal criminal laws").

[12] Sen. Rep. 98-225, at *60, 1983 WL 25404 (Aug. 4, 1983).

[13] *Id.* (emphasis added).

[14] *Id.* at *121.

**Reply to Government's Opposition to Motion for Compassionate Release**

BOP's history of controlling compassionate-release motions—and the agency's loss of unilateral power under the First Step Act—shows Congress intends more use of the sentence-reduction power. Since 1984, the agency has abided the miserly "death rattle rule"[15] in dispensing compassionate release: it files motions only for dying prisoners in their last months of life and virtually no one else—despite their own policy saying many others qualify.[16] And that is the opinion of DOJ's own inspector general. In a 2013 report, the OIG called the compassionate release program "poorly managed," and found most prisons granted only applications for terminal inmates with 6–12 months to live (depending on whatever the local warden felt), and over a 6-year look-back period, not a single other prisoner.[17]

Two years later, the OIG fired off another critical report, finding that while BOP claimed to have "expanded [its] compassionate release policy," the widely-touted expansion resulted in the release of "only two inmates."[18] One warden, in a moment of honesty, told the OIG that the expansion was "a policy that sounds good

---

[15] *Sentence Reduction Mechanism in Determinate Sentencing System: Report of the Second Look Roundtable*, 21 Fed. Sent. Rep. 211, 216, 2009 WL 8129932 (Feb. 2009); Mary Price, *A Case for Compassion*, 21 Fed. Sent. Rep. 170, 171 (Feb. 2009) (describing how the Bureau of Prisons brings "generally no more than twenty" compassionate release petitions each year, and describing the Department of Justice's death-rattle rule, which states that compassionate release should be reserved for those who are terminally ill).

[16] In 2019, the BOP filed 55 motions out of 1,735 received; 45 were terminal inmates, 11 were bed-ridden and debilitated; no motions were under the other medical, caregiver, spouse, or "other" categories. *See* Prince Decl., Attach. C (Letter from Kathleen Hawk Sawyer, Dir., Bur. of Prisons, to Jerrold Nadler, Chairman, House Jud. Comm. (Feb. 13, 2020)).

[17] Dept. of Just., Office of the Inspector General, *The Fed. Bur. of Prisons Compassionate Release Program*, at ii (Apr. 2013)(available at: https://bit.ly/2xfKomH). The report found there were no checks on wardens' ability to deny requests: "BOP does not conduct any systematic reviews of decisions made by Wardens or Regional Directors to ensure that they are consistent with each other and with the BOP's Program Statement and the underlying statutory authority." *Id.* at iii.

[18] Dept. of Just., Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, at iii (May 2015) (available at: https://bit.ly/39YFBTU) ("Aging inmates could be viable candidates for early release, resulting in significant cost savings; but BOP policy strictly limits those who can be considered and, as a result, few have been released.").

**Reply to Government's Opposition to Motion for Compassionate Release**

but does not accomplish much."[19] In short, years of OIG reports and criticisms changed nothing.

After the OIG failed to spur change, the Sentencing Commission tried its hand. It started where the OIG left off, noting BOP's "lengthy review" of applications was slow, produced abysmally "low approval rates," and the BOP "ignores the often precipitous decline in health or circumstances [that] can occur after imprisonment."[20] To loosen BOP's grip, the Commission broke down "extraordinary and compelling" reasons into four discrete categories *medical condition of the defendant*, *age of the defendant*, *family circumstances*, and in a clear attempt to broaden releases, a catch-all category—*other reasons*. Nothing changed.

Next, individual senators pleaded with BOP to broaden its compassionate release policy. In August 2017, a dozen senators—a bipartisan group—told BOP they were "deeply concerned that BOP is not fulfilling its role in the compassionate release process."[21] They put it bluntly: "BOP needs to take a hard look at expanding the use of compassionate release."

BOP took no hard look. It doubled down. In 2019, BOP received 1,735 applications and allowed the judiciary to look at just 55.[22] That is 3%. Last year, despite the OIG reports, the Sentencing Commission's amendment, and direct prodding from senators, BOP approved *zero* releases in the elderly-medical category (of 204 applications), *zero* releases under the caregiver category (of 120 applications), and despite the broad catch-all, precisely *zero* in the other-reasons category (of 330

---

[19]*Id.* at 46.

[20]U.S.S.G. § 1B1.13, amend 799 (Nov. 1, 2016) (available at: https://bit.ly/39WniyO).

[21]Letter from Sen. Brian Schatz et al. to Dr. Thomas Kane, Dir. Bur. of Prisons (Aug. 3, 2017) (available at: https://bit.ly/39XFGHo).

[22]Prince Decl., Attach. C (Letter from Kathleen Hawk Sawyer, Dir., Bur. of Prisons, to Jerrold Nadler, Chairman, House Jud. Comm. (Feb. 13, 2020)).

**Reply to Government's Opposition to Motion for Compassionate Release**
10

applications).[23] (It should conceded that the BOP did release Paul Manafort following the completion of one-third of his 7.5 year sentence to serve the balance on house arrest).

Just over a month ago, March 23, 2020, a bi-partisan group of senators, dismayed that the "BOP has opposed the vast majority of petitions" for compassionate release, wrote a letter urging the agency to "interpret[] [its policy] more broadly" and find that "vulnerability to COVID-19" was an extraordinary and compelling circumstance.[24] BOP has thus far ignored that common sense advice: it has made no changes to its policy.[25] BOP apparently has made not a single motion for compassionate release due to coronavirus vulnerability.

### d. Exhaustion Serves No Purpose.

Exhaustion here serves none of the purposes of an exhaustion rule (which is why Congress didn't impose an actual exhaustion rule). Whether required by the courts or Congress, exhaustion serves two purposes: (1) protecting administrative agency authority; and (2) promoting judicial efficiency. *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992) (discussing the "twin purposes"). Exhaustion in many scenarios is "commonsense notion"—it gives an agency "an opportunity to correct its own mistakes with respect to the programs it administers" before getting dragged into federal court. *Id.* The doctrine allows the agency to "produce a useful record," so if it is dragged into court, there is something the court can review. *See id.*[26] The exhaustion requirement is, simply put, a way to ensure out-of-court "dispute resolution." *See id.*

---

[23]*Id.* at 2.

[24]Letter from Senators Richard Rubin & Chuck Grassley, et al., to Att. Gen. William Barr & Dir. Michael Carvajal, Bur. of Prisons (Mar. 23, 2020) (available at: https://bit.ly/34mHVDb).

[25]Bur. of Prisons, *Compassionate Release / Reduction in Sentence: Procedures for Implementation*, Program Statement 5050.50 (Jan. 17, 2019) (available at:https://bit.ly/2Xmss4m).

[26]*See also Weinberger v. Salfi,* 422 U.S. 749, 765 (1975) (exhaustion may allow agency "to compile a record which is adequate for judicial review").

None of these exhaustion purposes is served in compassionate release cases. Exhaustion makes perfect sense when a prisoner sues BOP to provide medical care[27] or challenges a prison disciplinary sanction.[28] The agency can remedy those problems. And if the agency refuses, a court can step in. But strict exhaustion makes no sense where BOP is powerless to actually remedy anything, or even create an evidentiary record—as in compassionate release cases. Here, BOP never decides whether to release an inmate—that power is restricted to the courts. Nor does BOP create an evidentiary record. There is no adversary process, no agency hearings, no testimony, no agency action to correct. In short, Congress sensibly created a 30-day right-of-first refusal rule instead of a strict exhaustion rule precisely because exhaustion serves no purpose in compassionate release.

### e. Courts can and regularly do excuse statutorily-created exhaustion rules.

Even if § 3582 contained a true exhaustion rule (and it does not), courts can excuse even some statutorily-based exhaustion requirements. Even if exhaustion is "seemingly mandated by *statute* or decisional law, the requirement is not absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019) (emphasis added); *see also Granberry v. Greer*, 481 U.S. 129, 135–36 (1987) (holding "the general rule of exhaustion is not rigid and inflexible" in reviewing § 2254 habeas petition).[29] Indeed, courts look to congressional intent in determining how rigidly to apply exhaustion schemes: "the doctrine of administrative exhaustion should be applied with a regard for the particular administrative scheme at issue." *Smith v. Berryhill*, 139 S. Ct. 1765, 1776

---

[27] *See, e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976) (medical treatment may give rise to constitutional claims).

[28] *See, e.g.*, *Edwards v. Balisok*, 520 U.S. 641, 643 (1997) (suit against prison for loss-of-good-time-credit disciplinary sanction).

[29] Indeed, in this court, the government made a similar "exhaustion" argument before Judge Otero just last month. Despite all the concerns over "exhaustion," the Court ordered compassionate release. *See United States v. Wishner*, 14-cr-00712-SJO (Dkt. #155, Order Granting Compassionate Release dated March 27, 2020.)

**Reply to Government's Opposition to Motion for Compassionate Release**

(2019). For example, where "Congress wanted more oversight by the courts," as in social-security cases, even a statutory exhaustion requirement may be "excused by the courts." *Id.* at 1774, 1776.

Compassionate release is the same—Congress expressly sought to protect prisoners by increasing the use of compassionate release, unclenching BOP's long stranglehold on the process, and ensuring prisoners didn't die while BOP pondered release requests over months or outright ignored them.[30] Congress chose not to impose a strict exhaustion mandate, and the Court need only shorten the 30-day right-of-first-refusal window.

### f.     Courts have already excused exhaustion under § 3582.

Numerous courts have already excused the 30-day lapse.[31] Including this one. *U.S. v. Wishner*, Case No 14-cr-00712-SJO (Dkt. #155, March 27, 2020 Order Granting Compassionate release despite government complaints of failure to exhaust).

### 3. The Court Should Excuse the 30-day Wait.

Courts recognize three exceptions to exhaustion in compassionate release cases: (1) futility; where an agency process is unavailable or the agency has already

---

[30] *See* 164 Cong. Rec. H10346-04, at H10358, 2018 WL 6710302 (section titled "Increasing the Use and Transparency of Compassionate Release").

[31] *See, e.g.*, *U.S. v. Carver*, No. 19-cr-6044-SMJ (E.D. Wa. Apr. 8, 2020) (ECF No. 76 at 3:19) ("Defendant is excused from the administrative exhaustion requirement."); *U.S. v. Perez*, __ F. Supp. 3d __, 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (§ 3582 exhaustion excused); *U.S. v. Haney*, __F. Supp. 3d __, at *3 (S.D.N.Y. Apr. 13, 2020) (even though the "relevant exhaustion requirement is imposed by statute," Congress "cannot have intended the 30-day waiting period . . . to rigidly apply," and exhaustion is excused); *U.S. v. Zukerman*, 2020 WL 1659880, at *2 (S.D.N.Y. Apr. 3, 2020) (§ 3582 exhaustion waived); *U.S. v. Colvin*, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) (same); *U.S. v. Smith*, 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020) ("judicial waiver is permissible in light of the extraordinary threat certain inmates face from COVID-19"); *U.S. v. Bin Wen*, 2020 WL 1845104, at *4 (W.D.N.Y. Apr. 13, 2020) ("the law is well-established that even statutory exhaustion requirements—so long as not jurisdictional in nature—are subject to the doctrines of waiver and equitable estoppel" and granting release); *U.S. v. Powell*, No. 94-cr-316 (D.D.C. Mar. 28, 2020) (ECF No. 98) ("requiring defendant to first seek relief through the [BOP] administrative process would be futile"); *Thody v. Swain*, 2019 WL 7842560, at *2 (C.D. Cal. Nov. 26, 2019) (pre-coronavirus § 3582 case noting district court may excuse failure to exhaust).

**Reply to Government's Opposition to Motion for Compassionate Release**

determined the issue; (2) Undue Prejudice; where pursuing agency process would subject plaintiffs to undue prejudice, and; (3) incapacity to grant relief; where agency process would be incapable of granting adequate relief. *See United States v. Perez*, ___ F. Supp. 3d ___, 2020 WL 1546422, at *2 (SDNY, April 1, 2020). All three apply here. Waiting is futile because the infection rate, deaths and the inability of FCI-TI to properly care for its inmate population has already materialized.. Indeed, despite the government's reassurances, the spread of coronavirus, even at the FCI-TI facility, has been rampant. Because Mr. Longoria is in a high-risk group (insulin dependent diabetic), the court should dispense with the exhaustion requirement and release him, forthwith. In the alternative, it can modify Mr. Longoria's sentence so a portion of it could be spent on home confinement, at least until the present crisis abates.

## Conclusion

For the foregoing reasons, as well as those stated in the underlying motion, the Court should grant the requested relief.

Dated: May 20, 2020                    Anthony M. Solis,
                                       A Professional Law Corporation


                                       *Anthony M. Solis /s/*
                                       By: Anthony M. Solis
                                       Attorney for Defendant
                                       Derek Longoria